62 F.3d 1416
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Akeem WILLIAMS, a/k/a Kareen Porter, a/k/a Akeem Williamson,
a/k/a Kareen Fuller, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Shirle Lynn SMITH, Defendant-Appellant.
 Nos. 94-5834, 94-5855.
 United States Court of Appeals, Fourth Circuit.
 Aug. 10, 1995.
Argued: July 10, 1995
Decided: August 10, 1995
 
 Michelle Roman Fox, Robinson & Mcelwee, Clarksburg, West Virginia, for Appellants.
 Paul Thomas Camilletti, Assistant United States Attorney, Wheeling, West Virginia, for Appellee.
 William D. Wilmoth, United States Attorney, Wheeling, West Virginia, for Appellee.
 Before NIEMEYER, HAMILTON, and MICHAEL, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Appellants, Shirle Lynn Smith (Smith) and Akeem Williams (Williams), appeal their conviction for aiding and abetting the possession of cocaine base (crack) with the intent to distribute, see 21 U.S.C. Sec. 841(a)(1); 18 U.S.C. Sec. 2. Smith also challenges her sentence. For the reasons stated below, we affirm.
 
 
 2
 * On November 4, 1993, West Virginia Department of Public Safety Sergeants Mike Taylor (Taylor), Charles Jackson (Jackson), and Dave Spanovich (Spanovich) stopped a car driven by Smith and occupied by Williams. The facts surrounding the stop of the car are not contested. The officers were travelling together to attend a meeting in Buckhannon, West Virginia, when they observed the car driven by Smith passing their vehicle at a high rate of speed. At this time, intending to issue a citation for speeding, Taylor stopped Smith's car by activating his blue lights.
 
 
 3
 Taylor exited the cruiser and approached the driver's side of the car. He asked Smith for the registration card for the car, proof of insurance, and Smith's driver's license. Smith produced a photocopy of the registration card and certificate of insurance (which reflected that the car was registered to A & A Raines Auto Rental, Incorporated in Charleston, West Virginia, and was covered by a fleet insurance policy issued by Continental Insurance Company) and her valid West Virginia driver's license. At this time, Smith stated the car was rented, but was unable to produce a copy of the rental agreement. The passenger, Williams, was asked for identification, but he had none.
 
 
 4
 Taylor informed Jackson of the results of his inquiries, and then they walked from the cruiser to the car--Taylor was on the driver's side and Jackson on the passenger side. Williams was directed to get out of the car and go to the cruiser. At this time, Jackson saw what he believed were several small particles of crack on the front passenger-side floor mat.
 
 
 5
 In response to Taylor's question of where she and her passenger were en route from and where they were going, Smith stated that they were coming from Norfolk, Virginia, and going to Charleston, West Virginia. When Williams was asked the same question by Jackson and Spanovich, he responded that they were en route from Newark, New Jersey, to Charleston, West Virginia. He was asked if they were transporting any drugs in the car, and he said they were not.
 
 
 6
 Taylor called for an officer trained in drug interdiction to come to the scene. When the officer, Trooper Gerald Menendez (Menendez), arrived, he asked Smith if she had any knowledge of any drugs in the vehicle, and Smith responded in the negative. Menendez testified that Smith then gave verbal consent for a search of the car.
 
 
 7
 The officers conducted only a cursory search of the car at this time because the car was located on the berm of Interstate 79 near a high-traffic interchange during rush hour. The only items found during this search were the suspected crack particles on the front passenger-side floor mat, what appeared to be some marijuana seeds and residue in the rear seat area, and a plastic clothing-store bag and a flannel jacket in the trunk. The officers wanted to conduct a more thorough search of the car, so the officers sought Smith's consent to drive the car to a nearby State Police detachment; in response, Smith said "No problem." (J.A. 51).
 
 
 8
 After they arrived at the State Police detachment, a further search of the car was performed. While no additional drugs were found during this search, Jackson found the rental agreement under the front seat. It showed that the car was rented to one Gregory Lennard Johnson and that no one else was authorized to use it. The rental agency was contacted, and the police were requested to impound the car until the rental agency could arrange to send someone to pick up the car.
 
 
 9
 In the meantime, the officers had requested drug-sniffing dogs from the Fairmont Police Department and the Harrison County Drug Task Force. The officers and their dogs arrived, and before they began their search, a written consent to search the car was obtained from Smith. The use of the dogs did not produce any drugs, and Taylor, Jackson, and Spanovich left the State Police detachment to proceed to their meeting.
 
 
 10
 Menendez then went to the car to retrieve the articles of clothing still remaining there--the black jacket under which Williams was sleeping when the car was first observed, and a baseball cap. When he picked up the jacket by the collar, Menendez felt an object which, on inspection, proved to be two packages of what appeared to be crack. Menendez then called Taylor, Jackson, and Spanovich to return to the detachment, which they did, arriving in a matter of minutes. Jackson examined the contents of the two packages and performed a field test; the test was positive for cocaine. The jacket also contained the phone number of two individuals, purportedly friends of Troy Williams.[1]
 
 
 11
 On November 10, 1993, a grand jury sitting in the Northern District of West Virginia returned a one-count indictment charging the appellants with aiding and abetting the possession of crack with the intent to distribute, see 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2. At the conclusion of the trial, the jury convicted Smith and Williams. The district court sentenced Williams to forty-six months' imprisonment and Smith to sixty-three months' imprisonment. The appellants noted a timely appeal.
 
 II
 
 12
 Appellants appeal the district court's denial of their motion to suppress. Appellants contend their continued detention following the stop for speeding and the search of the car was conducted in violation of their Fourth Amendment rights. In making this argument, the appellants do not contest, nor could they, the validity of the initial stop for speeding.[2]
 
 
 13
 It is settled that an ordinary traffic stop is a limited seizure and is more akin to an investigative Terry stop than a custodial arrest. See United States v. Rusher, 966 F.2d 868, 875 (4th Cir.), cert. denied, 113 S.Ct. 351 (1992). We therefore assess the reasonableness of traffic stops under the principles set forth in Terry v. Ohio, 392 U.S. 1 (1968). See id. Terry asks "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. "If the initial traffic stop was illegal or the officers exceeded the stop's proper scope, the seized contraband is excluded under the 'fruit of the poisonous tree doctrine.' " Rusher, 966 F.2d at 875. We review the district court's factual findings under a clearly erroneous standard, United States v. Walker, 933 F.2d 812, 815 (10th Cir.1991), cert. denied, 112 S.Ct. 1168 (1992); however, the legal determination of reasonableness is a question of law, and, therefore, our review of this issue is de novo. Id.
 
 
 14
 Once an officer effectuates a routine traffic stop, the officer " 'may request a driver's license and vehicle registration, run a computer check, and issue a citation.' " Rusher, 966 F.2d at 876 (quoting United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir.1988)). Once the driver produces a valid license and proof that he or she is entitled to operate the car, the driver must be permitted to proceed. Id. "Any further detention for questioning is beyond the scope of the Terry stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime." Id. "Whether such an investigative detention is supported by an objectively reasonable suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances." United States v. Soto, 988 F.2d 1548, 1555 (10th Cir.1993).
 
 
 15
 Here, the officers' actions did not transgress the dictates of the Fourth Amendment. An officer may detain a driver until the officer is assured that the driver's license is valid and the driver is legitimately operating the vehicle. Rusher, 966 F.2d at 876; Guzman, 864 F.2d at 1519. Because the officers never received proof, i.e., a rental agreement indicating that Smith was authorized to drive the car, the duration of the detention at issue here was justified.
 
 
 16
 Simultaneously with this legitimate investigative detention, however, the officers questioned the appellants regarding the transportation of drugs. This questioning is justified only if the officers reasonably suspected that the appellants were transporting drugs. At the suppression hearing, the officers testified as to several factors heightening their suspicion that the car may have been transporting drugs; namely Smith's inability to prove authorization to operate the car, what appeared to be crack on the front floor mat, and the appellants' inconsistent stories regarding the route of their trip. These facts provided reasonable suspicion to justify an inquiry related to the transportation of drugs. We conclude that, to the extent the appellants were further detained for questioning, the detention was supported by reasonable suspicion and, therefore, was legitimate.
 
 
 17
 Finally, we must address the validity of the searches. "A defendant who voluntarily consents to a search waives his Fourth Amendment rights, and the police officer may conduct the search without probable cause or a warrant." United States v. Perrin, 45 F.3d 869, 875 (4th Cir.1995); see also Schneckloth v. Bustamonte, 412 U.S. 218, 235 (1973). In assessing the voluntariness of an individual's consent, the court should examine the totality of the circumstances. United States v. Mendenhall, 446 U.S. 544, 557 (1980); Schneckloth, 412 U.S. at 227. Legal conclusions involved in the district court's suppression determination are reviewed de novo, while factual determinations underlying the district court's legal conclusions are reviewed for clear error. Rusher, 966 F.2d at 873.
 
 
 18
 At the suppression hearing, Smith contested the issue of whether she verbally assented to a search of the vehicle. The lower court viewed the officers' testimony as more credible than that of the appellants and found that Smith verbally consented to the search. Nothing in the record suggests that the court's finding that Smith verbally assented to the search is clearly erroneous. The lower court had the opportunity to observe the demeanor of the witnesses, and we have no reason to take issue with the credibility determinations made by the court. Neither the officers' testimony nor any argument made by counsel suggests that the police used coercive tactics to gain Smith's consent. Under the facts as found by the lower court, the search of the vehicle at the berm on Interstate 79 and the State Police detachment was consensual and consistent with the Fourth Amendment. Accordingly, the district court properly denied the appellants' motion to suppress.
 
 III
 
 19
 Smith also challenges the sufficiency of the evidence to support her conviction. In reviewing the sufficiency of the evidence to support Smith's conviction for aiding and abetting the possession of crack with the intent to distribute, this court must view the evidence in the light most favorable to the government and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Giunta, 925 F.2d 758, 764 (4th Cir.1991). Possession of a controlled substance with the intent to distribute requires proof that an individual "(1) knowingly (2) possessed a controlled substance (3) with the intent to distribute it." United States v. Samad, 754 F.2d 1091, 1096 (4th Cir.1984); see also 21 U.S.C. Sec. 841(a)(1).
 
 
 20
 "Possession may be actual or constructive." United States v. Morrison, 991 F.2d 112, 114 (4th Cir.), cert. denied, 114 S.Ct. 225 (1993). "Constructive possession exists when the defendant exercises, or has the power to exercise, dominion or control over the item." United States v. Zandi, 769 F.2d 229, 234 (4th Cir.1985); United States v. Schocket, 753 F.2d 336, 340 (4th Cir.1985). And the government may rely on circumstantial evidence in establishing constructive possession. Morrison, 991 F.2d at 114. A defendant's intent to distribute may be established from the quantity of drugs constructively possessed. Samad, 754 F.2d at 1096.
 
 
 21
 The evidence presented at trial was as follows: (1) the appellants were returning to Charleston, West Virginia at a high rate of speed in a car rented by a third party; (2) 20.8 grams of crack was discovered hidden in the collar of the leather jacket; (3) the leather jacket was kept in plain view on the front seat; (4) the leather jacket contained phone numbers of friends of Troy Williams; (5) Troy Williams was Akeem's uncle and Smith's boyfriend; and (6) the small particles of crack found on the front passenger-side floor mat. Although this evidence is circumstantial and not overwhelming, we cannot conclude that any rational trier of fact could not find Smith guilty beyond a reasonable doubt. See Jackson, 443 U.S. at 319; Giunta, 925 F.2d at 764. From the evidence presented, the jury could properly conclude that Smith and Williams travelled to obtain the crack, obtained the crack, and hid it in the collar of the leather jacket for the return trip to Charleston, West Virginia; and clearly 20.8 grams of crack is a sufficient amount for the jury to infer an intent to distribute.
 
 IV
 
 22
 Smith argues that she was entitled to a four-level reduction in her offense level for her minimal role in the offense under United States Sentencing Commission, Guidelines Manual, Sec. 3B1.2(a). At sentencing, the district court granted Smith a two-level reduction in her offense level for her minor role in the offense under USSG Sec. 3B1.2(b), but denied her a further downward adjustment on the basis that 20.8 grams of crack was a large amount, and, therefore, a minimal role adjustment under USSG Sec. 3B1.2(a) was inappropriate.
 
 
 23
 Section 3B1.2 enables a court to reduce a defendant's offense level by four levels if he or she was a minimal participant in criminal activity, by two levels if he or she was a minor participant in criminal activity, or by three levels if his or her participation was less than minor but more than minimal. A defendant must show by a preponderance of the evidence that he or she is entitled to the downward adjustment he or she seeks. United States v. Gordon, 895 F.2d 932, 935 (4th Cir.), cert. denied, 498 U.S. 846 (1990). On appeal, this court will not disturb a district court's finding as to a defendant's role in the offense unless that finding is clearly erroneous. United States v. Daughtrey, 874 F.2d 213, 218 (4th Cir.1989).
 
 
 24
 Application Note 1 to Sec. 3B1.2 provides that the four level downward adjustment for a minimal participant in criminal activity:
 
 
 25
 applies to a defendant who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.
 
 Application Note 2 to Sec. 3B1.2 provides:
 
 26
 It is intended that the downward adjustment for a minimal participant will be used infrequently. It would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs.
 
 
 27
 Smith argues that she was a minimal participant because "the facts produced at sentencing show at most, Smith was a courier in a single drug transaction, she received no money for her participation, and she was only a small and insufficient participant in a larger drug transaction." Appellants' Brief at 26.
 
 
 28
 A defendant seeking to reduce his or her sentence based on mitigating circumstances must provide some evidence of mitigation other than conclusory statements. Gordon, 895 F.2d at 936. Smith provided no concrete evidence that she had a small role in acquiring the crack, or that her role was less culpable than Williams. Indeed, absent Smith's role as the driver, the crack would never have reached its intended destination. Thus, even if Smith was simply a courier, she was, nevertheless, " 'a highly culpable participant in the operation.' " United States v. White, 875 F.2d 427, 434 (4th Cir.1989) (quoting United States v. Buenrostro, 868 F.2d 135, 138 (5th Cir.1989), cert. denied, 495 U.S. 923 (1990)). Furthermore, we cannot take issue with the district court's finding that the crime did not involve a small quantity of drugs. The quantity of crack at issue here, 20.8 grams, is hardly insubstantial. In short, Smith failed to show by a preponderance of the evidence that she was entitled to a downward adjustment of her sentence for a minimal participant.
 
 V
 
 29
 Smith raises two other arguments which she contends should be resolved in her favor. First, Smith contends that the government violated the rule of Bruton v. United States, 391 U.S. 123 (1968), during its examination of a government witness. Second, Smith contends that the district court erred when it refused to depart downward based on extraordinary circumstances. We have reviewed these assignments of error and find them to be without merit. Accordingly, for the reasons stated, we affirm the appellants' conviction for aiding and abetting the possession of crack with intent to distribute, see 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2, and affirm Smith's sentence.
 
 AFFIRMED
 
 
 [1]
 Troy Williams is Akeem Williams' uncle and Smith's boyfriend; furthermore, Smith and Troy Williams have a child
 
 
 [2]
 We are puzzled that the government did not argue below or in this court that the appellants lacked standing to contest the validity of the search. See United States v. Jones, 44 F.3d 860, 871 (10th Cir.1995) (holding that a driver in exclusive possession of a car rented by a third party has no standing to challenge a search or seizure of the car); United States v. Obregon, 748 F.2d 1371, 1374-75 (10th Cir.1984) (same). The government having waived this issue, see Steagald v. United States, 451 U.S. 204, 209 (1981), we assume for the purposes of this appeal that the appellants have standing to contest the validity of the search of the vehicle